Simon FAIR, Plaintiff,

v.

AMP INCORPORATED, Defendant.

No. C–C–84–512–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

April 8, 1986.

Shelley Blum, Charlotte, N.C., for plaintiff.

David A. Irvin, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on a Complaint filed by the Plaintiff, Simon Fair ("Fair"), against the Defendant, AMP Incorporated ("AMP"), in which Fair alleges

that he was demoted from third shift foreman in his employment with AMP because of his race and in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission in February of 1983.

The trial was heard before the undersigned without a jury on March 18, 1986 in Charlotte, North Carolina. Fair was represented by Attorney Shelley Blum. AMP was represented by Attorneys David A. Irvin and William J. Ward. After a full trial of the matter, the Court, having carefully considered the testimony and exhibits, enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) This action was brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

(2) The Plaintiff, Simon Fair, is a black citizen of the United States who resides in Mecklenburg County, North Carolina.

(3) The Defendant, AMP Incorporated, is a Pennsylvania corporation doing business in Charlotte, North Carolina.

(4) AMP is engaged in the manufacturing of plastic electrical connectors at its Charlotte plant. This process involves using machines to mold plastics and other types of raw materials into connectors.

(5) Fair began working for AMP in August 1968 as a compression mold operator. He was promoted to set-up adjuster in 1970, to group leader in 1973, to assistant production foreman in 1980, and to third shift foreman in 1981. Fair has continued to work for AMP to date.

(6) In 1982, AMP installed new management at its Charlotte plant to improve production performance which had fallen significantly. The new management team included David Forbes ("Forbes"), production supervisor, who had the responsibility of improving the efficiency of the Charlotte facility.

(7) At that time, all foremen, including Fair, were given a list of goals to meet which included improving production performance and reducing scrap.

(8) For the next several months, first and second shift foremen improved their production but Fair's production performance did not improve.

(9) On February 22, 1983, Fair filed a charge of discrimination with the EEOC, charge number 045830502, alleging Forbes harassed him and threatened him with termination on account of his race.

(10) Fair withdrew that charge on March 30, 1983 after being assured by a personnel representative of AMP that any possible harrassment would cease.

(11) Fair filed a second charge, Number 045831554, of discrimination with the EEOC on August 24, 1983, amended August 31, 1983, alleging harassment and an unfair evaluation on account of race and retaliation for filing the first charge of discrimination. The charge was further amended on November 22, 1983 to allege demotion as a retaliatory action. On June 24, 1984, the EEOC concluded there was no reasonable cause to believe Fair's allegations of race discrimination and issued a right-to-sue letter to Fair.

(12) Fair's work record prior to 1982 indicates good work performance and training involvement. From 1974 to 1983, Fair participated in at least nine different training courses offered by AMP. [Pltf. Ex. 7.] His performance appraisals for 1980 and 1981 reflect Fair as a qualified foreman devoted to his job. [Pltf. Exs. 8, 9.] In 1982, Forbes rated Fair's overall performance as "good." Forbes testified, however, that because he had not had an ample opportunity to observe and work with Fair due to Forbes' having been at the Charlotte plant only a few months, he presumed Fair's performance as good during this period.

(13) By June 1983, Fair was placed on probation upon the recommendation of Forbes for lack of acceptable improvement in performance based on observations of Forbes and certain complaints [Pltf. Ex. 11.] Fair was given a program to improve performance in specific areas, such as:

training and administration of personnel, communicating with and motivating employees, and preventing the occurrence of scrap on his shift.

(14) Fair acknowledged that the new management team was implementing new procedures and tighter controls plant-wide. Forbes compared all three shift foremen's performance levels. All three shift foremen received a list of specific goals to meet in job performance in the beginning of 1983.

(15) While on probation, Fair knew he would be evaluated regularly for the following three months by Forbes and knew that his shift would continually be compared with the other two shifts.

(16) Fair received performance evaluations on June 23, July 15, August 15, August 31, September 15, September 30, and October 18, 1983. At the end of the three month probation period, Fair's performance did not show adequate improvement in the areas of communicating with employees, training employees, low efficiency, high scrap levels, and poor judgment and decision-making. [Deft. Ex. 8.]

(17) During the probationary period, Forbes counselled with Fair, pointing out the problems with production in Fair's shift; but Fair was not receptive to these counselling sessions and even refused to sign Forbes' evaluation reports.

(18) Fair testified that he was harassed by Forbes from May, 1982 because of his race and that Forbes and Brent Mitchell, the plant manager, in retaliation against Fair for filing the EEOC charge, discriminated against Fair in criticizing his work before subordinates, blaming him for conditions caused by others, blaming him for conditions unique to the third shift, denying him assistance and refusing to work with him, placing him on probation, threatening to terminate him, demoting him to first shift group leader, wrongfully denying him time off, attempting to enlist him to stop an instance of interracial dating at the plant while not applying the same strict scrutiny to the performance of white couples dating at the plant and by Forbes

stating that he would "get rid of that nigger one way or another." Fair contended at trial that these actions of AMP reflected the real reason for his demotion, racial discrimination and retaliation.

(19) The evidence at trial indicated that Fair's shift was responsible for plant start-ups on Sunday nights; new hires were first assigned to third shift; absenteeism has been traditionally worse on third shift; and clean-up during third shift was made somewhat more difficult by debris left over from the first and second shifts. Thus, the third shift experienced unique problems which affected its performance and efficiency. However, the other two shifts likewise experienced unique problems. For instance, second shift was responsible for shutting down on Friday nights, and both first and second shifts were responsible for adequate clean-up.

(20) In any event, there was credible testimony that the problems unique to the third shift were not so extensive as to cause Fair's low production and efficiency ratings and high scrap levels. [Deft. Exs. 4, 5, 6, 7, and 8.]

(21) Forbes credibly testified that he did not criticize Fair before his subordinates but that because the plant machines were in operation when Forbes was reviewing the boxes of scrap with Fair, Forbes talked in a loud voice.

(22) Forbes also testified that to help Fair, he worked with Fair during the third shift, but instead of Fair working under Forbes' observation, Fair would turn the floor over to him thereby eliminating the opportunity of Forbes to observe and note means of improvement.

(23) Forbes and Fair got into a dispute about one incident in which Fair scrapped approximately 1,800 pounds of materials which had been damaged by an outside cleaning agency. Testimony for both sides showed that this dispute could have easily arisen out of simple difference of opinion; but, testimony did not show that this dispute was due to any discriminatory motive

of Forbes or that it was part of any discriminatory scheme.

(24) Both Forbes and Mary Clark testified that Forbes never referred to Fair nor anyone else as "nigger." The testimony of Fair's witness, Brenda Roddy, that she heard Forbes state to Mary Clark that he was "going to get rid of that nigger one way or another," is not persuasive in light of direct testimony to the contrary and due to the fact that Clark has also filed a charged of discrimination against AMP.

(25) Fair introduced the testimony of several witnesses who had been with AMP for many years and all testified that they had no problem in communicating with Fair. However, Fair did not produce persuasive evidence that new employees were not having problems in communicating with him; Forbes' observations were that part of Fair's problems consisted of his inability to communicate with, motivate and train employees who did not have much experience. [Deft. Exs. 4, 5, 6, 7, and 8.]

(26) Testimony showed that the management of AMP was as concerned with white couples' dating relationships as it was with the interracial couple. One couple, each of which was married, was given an oral reprimand to stay away from one another during work. The management of AMP was concerned with work performance and there was no evidence which showed that Fair was asked to watch the interracial couple for any other reason than to make sure their relationship did not affect their work performance.

(27) Forbes credibly testified that race had no significance whatsoever in evaluating Fair, but that he recommended that Fair be demoted because Fair's performance levels did not improve during the probationary period and remained unsatisfactory.

(28) In November 1983, AMP demoted Fair from first shift foreman to first shift group leader. In doing so, AMP created a second group leader's position during the first shift for the first time. In July 1984, Fair was moved to set-up adjuster, and received a reduction in pay due to the fact that the company eliminated group leader positions plant-wide.

(29) This Court finds as a fact that the evidence presented at trial did not show that Fair was demoted on account of his race nor in retaliation for his having filed a charge of discrimination with the EEOC nor that Fair was harassed because of his race or in retaliation. Fair was demoted because his performance remained unsatisfactory during a time when AMP sought plant-wide performance improvement. AMP's explanations are both credible and nonpretextual. This Court does not express an opinion as to whether Fair's performance could not have improved had different circumstances existed. The Court simply says that the evidence presented does not show racial discrimination.

(30) Any finding of fact which is deemed a conclusion of law is so deemed, and any conclusion of law which is deemed a finding of fact will be so deemed.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343.

(2) AMP is subject to the jurisdiction of this Court and is an "employer" as defined by 42 U.S.C. § 2000e(b), being engaged in an industry affecting commerce and employing in excess of fifteen employees.

(3) Title VII, 42 U.S.C. § 2000e–2(a)(1), provides in pertinent part, that:

> It shall be unlawful employment practice for an employer— ... to discharge any individual ... because of such individual's race.

Section 2000e–3(a) provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice and made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

■ (4) In a private, non-class-action complaint under Title VII charging racial employment discrimination, the claimant has the burden of first establishing a *prima facie* case of discrimination or retaliation. *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Such a *prima facie* case can be established by showing:

(1) plaintiff belongs to a racial minority;

(2) plaintiff was qualified for the job;

(3) though qualified, plaintiff was rejected (demoted); and

(4) the employer continued to seek applicants with plaintiff's qualifications.

(5) To establish a *prima facie* case of discrimination, the claimant must prove

actions taken by an employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on discriminatory criterion under the Act."

*Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

■ (6) If Plaintiff succeeds in proving the *prima facie* case, the burden shifts to the Defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. The Defendant's burden is one of production only. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). *See also, Ross v. Communication Satellite Corp.*, 759 F.2d 355 (4th Cir.1985).

■ (7) Should the Defendant carry his burden, then the Plaintiff must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by Defendant were not its true reasons, but were a pretext for discrimination. To show pretext, Plaintiff must show that Defendant's reasons were fabricated, that is, that a discriminatory reason more likely motivated the employer or that the

employer's proffered reason is unworthy of credence. *Id.*

■ (8) The ultimate burden of persuading the trier of fact that the Defendant intentionally discriminated against the Plaintiff remains at all times with the Plaintiff. *Id.*

■ (9) To establish a *prima facie* case of retaliation, the Plaintiff must establish by a preponderance of the evidence that:

(1) the employee engaged in protected activity;

(2) the employer took adverse employment action against the employee; and

(3) a causal connection existed between the protected activity and the adverse action.

*Ross v. Communications Satellite Corp., supra.*

■ (10) Under either the *McDonnell-Douglas* or the *Furnco Construction* proof scheme, Fair has not established a *prima facie* case because he has not shown by a preponderance of the evidence that he was demoted although qualified for the position of third shift foreman. The evidence in the case revealed that Fair failed to improve third shift performance before and during the probationary period. Without improving the shift's performance, Fair could not be maintained as a foreman. Fair's evidence that he could not improve performance due to the alleged discriminatory and alleged retaliatory actions of AMP does not change the Court's conclusion that Fair failed to establish a *prima facie* case. As noted in the findings of fact, Fair's evidence does not account for continued low levels of performance despite problems unique to the third shift and the testimony of Fair and other witnesses called on his behalf does not sufficiently indicate that Fair was prevented from improving his performance by Forbes or anyone else.

(11) Further, the Court concludes that Fair has failed to establish a *prima facie* case of retaliation because he has not established by a preponderance of the evidence that a causal connection existed be-

tween his filing an EEOC charge and his demotion. In fact, the fact that Fair filed an EEOC charge more likely than not caused AMP to treat Fair more favorably by putting him on a probationary period in which to improve.

(12) Even if Fair had established a *prima facie* case of discrimination or retaliation, the Court concludes that AMP offered substantial evidence that Fair's demotion was based on legitimate, nondiscriminatory business considerations. AMP not only articulated its reasons for demoting Fair but also showed by a preponderance of the evidence that it decided to demote Fair because it sincerely believed Fair was not able to improve his shift's performance. This Court does not need to judge the correctness of AMP's assessment of Fair's abilities; it need only determine that AMP believed in good faith that Fair's performance was unsatisfactory and that the asserted reason for the demotion decision was not a mere pretext for discrimination. *Moore v. Sears Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir.1982); *Bostic v. Wall*, 588 F.Supp. 994, 1002 (W.D.N.C. 1984), *aff'd.*, 762 F.2d 997 (4th Cir.1985). The Court concludes that Fair failed to show by a preponderance of the evidence that AMP's reasons for demoting Fair were a pretext for race discrimination or that the demotion would not have occurred "but for" the fact that he filed an EEOC charge. *See, Ross, supra* at 365–66.

(13) Consequently, the Court concludes that Fair should not prevail on any of his claims for the above-stated reasons.

(14) A judgment dismissing Fair's action with prejudice will be filed simultaneously with this Memorandum of Decision.